# UNITED STATES DISTRICT COURT
### for the
### Eastern District of California

**FILED**

**Jan 09, 2024**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

## SEALED

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
|  | ) | Case No.    2:24-mj-0005 DB |
| DELANIOUS WARD, ALBERT GURLEY, AGUSTIN GONZALEZ, CRAIG HUNTER, KEVIN YANCY, JORGE MEJIA-NOLASCO, MANUEL GREENHALGH, DAVID BYRD | ) ) ) ) | |

*Defendant(s)*

# CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___October 2, 2019 through July 3, 2020___ in the county of ___Sacramento___ in the ___Eastern___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Count 1 - 21 U.S.C. §§ 846 and 841(a)(1); | Conspiracy to distribute and possess with intent to distribute at least 100 grams of a mixture and substance containing heroin and at least 40 grams of a mixture and substance containing fentanyl (WARD, GURLEY, GONZALEZ, HUNTER); |
| Count 2 - 21 U.S.C. §§ 846 and 841(a)(1); | Conspiracy to distribute and possess with intent to distribute a mixture and substance containing heroin (WARD, GURLEY, GONZALEZ, YANCY); |
| Counts 3 and 4 - 21 U.S.C. § 841(a)(1); | Possession with intent to distribute at least 40 grams of a mixture or substance containing fentanyl and possession with intent to distribute at least 100 grams of a mixture and substance containing heroin on October 3, 2019 (MEJIA-NOLASCO); |
| Count 5 - 21 U.S.C. § 841(a)(1); | Possession with intent to distribute at least 100 grams of a mixture and substance containing heroin on May 17, 2020 (GREENHALGH); |
| Count 6 - 21 U.S.C. § 841(a)(1). | Possession with intent to distribute at least 40 grams of a mixture or substance containing fentanyl on June 30, 2020 (BYRD). |

This criminal complaint is based on these facts:

(see attachment)

☒  Continued on the attached sheet.

___/s/___
*Complainant's signature*

Brian Nehring,
Special Agent Drug Enforcement Administration
*Printed name and title*

Sworn to me and signed via telephone.

Date:   ___January 9, 2024___

City and state:   ___Sacramento, California___

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT, ARREST WARRANTS & SEARCH WARRANTS

I, Drug Enforcement Administration Special Agent Brian Nehring, being duly sworn, hereby state:

1.   This Affidavit is submitted in support of a Criminal Complaint charging the following people with the following crimes:

     a.   Delanious WARD, Albert GURLEY, Agustin GONZALEZ, and Craig HUNTER with a violation of 21 U.S.C. §§ 846 and 841(a)(1) – conspiracy to distribute and possess with intent to distribute at least 100 grams of a mixture and substance containing heroin and at least 40 grams of a mixture and substance containing fentanyl;

     b.   Delanious WARD, Albert GURLEY, Agustin GONZALEZ, and Kevin YANCY, with a violation of 21 U.S.C. §§ 846 and 841(a)(1) – conspiracy to distribute and possess with intent to distribute a mixture and substance containing heroin;

     c.   Jorge MEJIA-NOLASCO with two violations of 21 U.S.C. § 841(a)(1) for possession with intent to distribute at least 40 grams of a mixture or substance containing fentanyl and possession with intent to distribute at least 100 grams of a mixture and substance containing heroin on October 3, 2019.

     d.   Manuel GREENHALGH, with a violation of 21 U.S.C. § 841(a)(1) – possession with intent to distribute at least 100 grams of a mixture and substance containing heroin on May 17, 2020;

     e.   David BYRD with a violation of 21 U.S.C. § 841(a)(1) – possession with intent to distribute at least 40 grams of a mixture or substance containing fentanyl on June 30, 2020.

2.   This affidavit is also made in support of Search Warrants for the following locations:

    A.) GONZALEZ's current residence located at **19589 McKinley Avenue, Manteca, California;**

    B.) GURLEY's current residence located at **8364 Bloomington Drive, Sacramento, California**;

    C.) WARD's current residence located at **8499 Marvista Court, Elk Grove, California**;

3.    I am a special agent of the Drug Enforcement Administration (DEA), San Francisco Field Division, and have been so employed since 1991. I have had numerous DEA assignments, including the San Francisco Division Office between 1991 and 1994, the Alameda County Narcotics Task Force between 1995 and 1996, the San Francisco Division Clandestine Laboratory Enforcement Team from 1997 to 1999, the Oakland Resident Office between 1999 and 2002, and the Mobile Enforcement Team (MET) between 2002 and 2004. I have been assigned to the Sacramento Division Office since September of 2004.

4.    As detailed below, court-authorized Title III intercepts of WARD's, GURLEY's, and GONZALEZ's identified telephones in 2019 and 2020 showed that the targets identified above were involved in trafficking or conspiring to traffic large quantities heroin and/or fentanyl.

5.    Unless otherwise noted, all telephone calls and text messages were recorded.

**PROBABLE CAUSE**

**Target Overview**

6.    Based on the facts summarized below, I believe Delanious WARD and Agustin GONZALEZ are large-scale cocaine, heroin, and fentanyl traffickers who partnered and agreed with each other and the individuals below to operate and profit from their drug trafficking organizations. I believe that each of the below individuals engaged in multiple phone calls and/or text messages to facilitate their respective conspiracies. These communications – intercepted by way of a Title III wiretap – served as overt acts of the large conspiracies in which these individuals were involved, as summarized below.

   a.    **Delanious WARD** (prior federal drug conviction) partnered with his main source of supply Agustin GONZALEZ, his half-brother, Albert GURLEY, and his close confidant Craig HUNTER during 2019 and 2020 in the purchase and distribution of large quantities of heroin and fentanyl.

   b.    **Albert GURLEY** (prior federal drug conviction on federal supervised release) assisted his half-brother, WARD, who was having difficulty obtaining additional heroin from GONZALEZ due to a pending debt, by arranging for the delivery of a kilogram of heroin and a large quantity of fentanyl pills in October 2019. That fentanyl and those pills were seized by law enforcement from Jorge MEJIA-NOLASCO. GURLEY also was intercepted repeatedly discussing with WARD his intended drug dealing activities after having just been released from the Federal Bureau of Prisons in 2019.

2

c. **Agustin GONZALEZ (**prior state drug convictions) was WARD's main source of supply for heroin and cocaine. He was intercepted and observed meeting multiple times with WARD to discuss the large amount of drug proceeds WARD owed him for kilogram quantities of heroin previously provided and the delivery of additional heroin. GONZALEZ was subsequently intercepted partnering with and sourcing large amounts of heroin and fentanyl pills to Manuel GREENHALGH and David BYRD, respectively.

d. **Jorge MEJIA-NOLASCO** was identified as the partner of one of GURLEY's Mexican heroin and fentanyl sources. GURLEY arranged for the delivery of heroin and fentanyl from this Mexican source to WARD. MEJIA-NOLASCO was arrested in possession of these drugs and subsequently admitted that he was working directly for a Mexican cartel to which he owed money. MEJIA-NOLASCO was released and is believed to have fled the country.

e. **Kevin YANCY** (prior federal drug conviction) was identified as WARD's main sub-distributor for heroin located in New Orleans, Louisiana. During the wiretap in 2019, YANCY and WARD discussed YANCY's difficulty distributing the poor-quality heroin in New Orleans and paying WARD the money owed.

f. **Craig HUNTER** (prior federal drug conviction on federal supervised release) was WARD's trusted drug-trafficking partner and was intercepted and observed meeting with WARD to discuss heroin trafficking. During these intercepts, they discussed the drugs that HUNTER had fronted WARD and for which he still owed money and WARD's efforts to obtain additional heroin from GONZALEZ to provide to HUNTER. WARD also requested that HUNTER protect him from GONZALEZ during an in-person drug-trafficking meeting between WARD and GONZALEZ.

g. **Manuel GREENHALGH** was intercepted and observed meeting with GONZALEZ to obtain heroin from him at his residence in Stockton. When GREENHALGH departed he was contacted by San Joaquin County Sheriffs and found to be in possession of just under two kilograms of heroin.

h. **David BYRD (prior felony conviction on state probation)** was intercepted and observed meeting with GONZALEZ to obtain fentanyl pills from GONZALEZ at his residence in Stockton. After meeting with GONZALEZ, BYRD was contacted by the California Highway Patrol (CHP) and found to be in possession of multiple thousands of fentanyl pills (216 grams) as well as a pistol and a large amount of United States Currency.

**TIII Interception Overview**

7. On July 12, 2018, United States District Judge Troy L. Nunley authorized the wire interception of cocaine trafficker Tyrone ANDERSON's self-reported telephone (916) 207-0420, Target Telephone 1. Interception started on July 16, 2018.

8. On February 15, 2019, the Court authorized the wire and electronic interception of ANDERSON's identified cocaine source, Maurice BRYANT's, telephone, Target Telephone 2 (TT#2). Interception began on February 19, 2019. During that wiretap, the government identified BRYANT's cocaine source supply as Wilmer HARDEN.

9. On September 30, 2019, the Court authorized wire and electronic interception of HARDEN's identified cocaine source of supply, Delanius WARD's, telephones: Target Telephone 3 ("TT#3") and wire interception of Target Telephone 4 ("TT#4). Interception of wire and electronic communications over TT#3 and wire communications over TT#4 began on October 2, 2019. On October 18, 2019, the Court authorized electronic interception of TT#4. Interception of electronic communications over TT#4 began on October 18, 2019. TT#3 and TT#4 are prepaid T-Mobile telephones used by Delanious WARD. The government terminated interception on October 31, 2019.

10. On May 1, 2020, the Court authorized wire and electronic interception of Target Telephone 5 (TT#5) and Target Telephone 6 (TT#6). TT#5 is an AT&T telephone used by Agustin GONZALEZ. TT#6 is a T-Mobile telephone used by Albert GURLEY. Interception of TT#6 terminated on June 3, 2020.

11. On June 2, 2020, the Court authorized continued wire and electronic interception of TT#5, wire and electronic interception of Target Telephone #7 (TT#7), and wire interception of Target Telephone 8 (TT#8). TT#7 is a T-Mobile telephone used by a drug trafficking partner of Agustin GONZALEZ. TT#8 is a Verizon telephone used by Agustin GONZALEZ. Interception of TT#5, TT#7, and TT#8 terminated on July 3, 2020.

**Title III intercepts of Maurice BRYANT identifying Delanious WARD as the Cocaine Source of Supply to the BRYANT DTO via Wilmer HARDEN**

12. In 2018 and 2019, I started investigating the cocaine and cocaine base trafficking activities of Maurice BRYANT, with whom I was familiar from prior drug investigations. I conducted court-authorized intercepts of a multiple-kilogram cocaine sub-distributor of BRYANT, Tyrone ANDERSON, over Target Telephone #1 (TT#1) in 2018. During these intercepts, I monitored BRYANT using Target Telephone #2 (TT#2) to supply ANDERSON with multiple kilograms of cocaine in Sacramento County, several kilograms of which was seized during the periods of interception. During authorized intercepts of BRYANT over TT#2 in 2019, I

monitored BRYANT supplying other sub-distributors in addition to ANDERSON, resulting in significant cocaine base seizures.

13. During these intercepts, I monitored BRYANT regularly contacting and meeting with an individual whom I identified as Wilmer HARDEN. I was familiar with HARDEN from separate prior drug investigations. I formed the belief based upon these intercepted calls over TT#2 and the concurrent surveillance that BRYANT was obtaining multiple kilograms of cocaine from HARDEN.

14. On June 3, 2021, ANDERSON, BRYANT, and HARDEN were indicted in a cocaine trafficking conspiracy, along with 12 additional co-conspirators. *See United States v. Bryant et al*, 2:21-cr-00104-TLN, ECF 54.

15. During the interception of BRYANT's phone, I noted a pattern that developed when BRYANT contacted HARDEN for cocaine. Following calls from BRYANT requesting additional kilograms of cocaine, HARDEN's telephone contacted the phone number (916) 912-1816, Target Telephone #3 (TT#3), identified as used by Delanious WARD. I noted that HARDEN's telephone contacted TT#3 on regular occasions following BRYANT's requests and during the time when HARDEN claimed to BRYANT to have contacted the cocaine source of supply. WARD had previously supplied TT#3 as his own number in the past, and GPS ping location data for TT#3 showed it in WARD's possession as observed during subsequent surveillance.

16. I was aware from multiple investigations conducted by myself and by other agents in the last 25 years that WARD had been identified as a multiple kilogram cocaine, cocaine base, and heroin dealer based in the Sacramento, California area but operating throughout the United States. I was aware that WARD was arrested for possession of two kilograms of cocaine base in Louisiana in 1994, that he was convicted of a violation of Title 21 U.S.C. § 841(a)(1), Possession with Intent to Distribute Cocaine Base, and that he has other drug felony convictions in California for offenses including Possession of Cocaine Base for Sale. I knew from reviewing DEA reports that after being released from federal prison and returning to California, WARD was identified by more than one federal defendant in the late 2000's as a large cocaine and methamphetamine dealer in the Sacramento area. I was also aware that WARD was convicted of Possession of Cocaine Base for Sale in Sacramento County after returning to California. I personally spoke with three separate individuals between 2010 and 2015 who all related to me that Delanious WARD was allegedly converting up to 10 kilograms of cocaine into cocaine base at a time which he was then distributing, in addition to large amounts of heroin, through various individuals, including his brother Albert GURLEY and members of violent local street gangs including the G-MOBB and CREEK MOB in South Sacramento and through individuals out of state. I believed based upon WARD's documented history and his high-frequency contact with HARDEN that it was highly likely he was the multiple kilogram cocaine

5

and/or cocaine base source of supply to HARDEN and by extension BRYANT and ANDERSON.

17. I had also previously conducted an investigation of WARD's identified brother, Albert GURLEY, beginning in 2010, and arrested him on federal charges in Sacramento in 2011 for possession and distribution of approximately a half-kilogram of cocaine base. GURLEY had sold over 250 grams of cocaine base to a confidential source, and when I executed a search warrant at his residence, I located approximately 350 grams of cocaine base. GURLEY pled guilty to a violation of Title 21 U.S.C. § 841(a)(1) and was sentenced in 2012 to 108 months in federal prison and 60 months supervised release.

18. Additional analysis of WARD's identified cellular telephones in late 2019 revealed that they were in contact with a number (209-405-3572) identified as used by Agustin GONZALEZ. Subsequent court-authorized ping orders for this telephone showed it routinely located at GONZALEZ's identified and self-reported residence at 4780 EWS Woods Boulevard, Stockton, California including at times GONZALEZ was observed there. Surveillance of GONZALEZ's Stockton residence in 2019 showed WARD's identified vehicles present there as well. I learned that between 1998 and 2009 Agustin GONZALEZ (56 years old) had been identified by confidential sources during the course of more than one DEA investigation as a large-scale drug trafficker supplying cocaine and heroin to the MILLAN drug trafficking organization of which his wife, Martha, was a family member, in Stockton, California. A family member of GONZALEZ related in 2009 that GONZALEZ was using multiple family members to transport multiple kilograms of cocaine and drug proceeds back and forth between Los Angeles and Stockton in "trap" vehicles – *i.e.*, vehicles with hidden compartments – at the behest of a "boss" in Sinaloa, Mexico.

19. Inquiries with NCIC revealed that GONZALEZ has a criminal history including a felony arrest in Stockton, California in 1987 for Possession of a Controlled Substance for Sale. He also has a 1994 arrest in Bakersfield, California for Transportation/Sales of a Controlled Substance, Possession of a Controlled Substance for Sale, Use of a Fake Compartment to Conceal a Controlled Substance, and Conspiracy to Commit a Crime. This arrest resulted in a conviction for Transportation/Sales of a Controlled Substance and a 4-year prison commitment.

20. I learned that WARD was also using a second telephone, (916)583-1908, hereinafter referred to as Target Telephone #4 (TT#4), which was also subscribed in the same name, Azim Rasal, and which he had also self-provided. Analysis of WARD's use of TT#3 and TT#4 showed these telephones in continued high-frequency contact with the identified telephone used by GONZALEZ at that time.

**Interception of wire and electronic communication of WARD over TARGET TELEPHONES 3 and 4 in October 2019 leads to positive identification of GURLEY and GONZALEZ as WARD's sources of supply**

21.    On September 30, 2019, the Court authorized the interception of wire and electronic communication over TT#3 and wire communication over TT#4 for a period of 30 days.  The interception began on October 2, 2019, and concluded on October 31, 2019.  On October 18, 2019, the Court authorized the interception of electronic communication over TT#4.  That interception of electronic communication over TT#4 began on October 19, 2019, and concluded on October 31, 2019.

22.    Upon initiation of wire interception, it immediately became apparent that WARD was engaged in distributing cocaine, heroin, and methamphetamine in the Sacramento area as well as in New Orleans, Louisiana.  WARD was intercepted contacting an individual identified as Kevin YANCY in New Orleans regarding the status of what I believe was large quantities of heroin he had delivered to YANCY via GONZALEZ.  Per GPS ping phone locator information, GONZALEZ's telephone (the predecessor to Target Telephone 5 – TT#5 **916-712-5816**) traveled to New Orleans and back to California just prior to the initiation of the intercepts.

23.    WARD was also intercepted being called by various customers checking on the availability of cocaine, heroin, and methamphetamine. WARD contacted YANCY at 504-388-4779. This number was self-reported as belonging to Kevin YANCY of New Orleans, Louisiana.  During later calls, the voicemail to this number stated that the phone number belonged to "Kevin YANCY."  YANCY has a prior federal conviction for Possession of Cocaine for Sale and was sentenced to 120-month prison in 1994.  During initial intercepts, GONZALEZ called and texted WARD's telephone, repeatedly leaving messages inquiring into the status of the money WARD apparently owed him for the drugs that had been delivered to Louisiana. WARD repeatedly avoided GONZALEZ's calls, messages, and texts.

**Albert GURLEY arranges for WARD to receive drugs subsequently seized from Jorge MEJIA-NOLASCO**

24.    WARD was intercepted speaking with his brother Albert GURLEY over cellular telephone 916-912-7192, hereinafter referred to as TARGET TELEPHONE 6 (TT#6).  GURLEY discussed having recently been released from federal prison and returning home from the federal half-way house.  GURLEY also openly discussed the fact that he had "networked" while in federal prison and currently had two definite sources, one for multiple kilograms of cocaine and one for large amounts of heroin and methamphetamine.  GURLEY referred to the heroin and methamphetamine source he had been incarcerated in federal prison with alternately as "Chango" and "Jungle."  GURLEY indicated that he would arrange for WARD to obtain a large amount of heroin and methamphetamine from this

7

particular source of supply and that WARD would have to go to Modesto, California to obtain the drugs, which would be delivered there on October 3, 2019.

25. On October 3, 2019, WARD was intercepted being contacted by an individual subsequently identified as Jorge MEJIA-NOLASCO using a Mexico area-code telephone. MEJIA-NOLASCO told WARD that he was the person who was supposed to bring a vehicle to WARD on behalf of GURLEY but that the vehicle had broken down just off the highway in Lebec, California. MEJIA-NOLASCO requested that WARD come to get him, and WARD agreed. WARD was then intercepted speaking with GURLEY at TT#6, during which WARD related that GURLEY's "people" had called him because they had broken down. GURLEY told WARD to go ahead and travel to Lebec to help MEJIA-NOLASCO but not to discuss prices and amounts because that had not been agreed to yet.

26. Based upon this information, I contacted the California Highway Patrol (CHP) and requested that they attempt to locate the vehicle MEJIA-NOLASCO had described at the location MEJIA-NOLASCO had provided. CHP Officers located MEJIA-NOLASCO in that vehicle in that location in Lebec and contacted him at approximately 10:30 p.m. As this was occurring, the GPS location pings on WARD's phone showed it traveling in route from Sacramento, California to Lebec in Kern County. A narcotics canine alerted to the presence of drugs in MEJIA-NOLASCO's vehicle, and a subsequent search located approximately 1.5 kilograms of suspected tar heroin and what is believed to be a large amount of counterfeit blue M30 Oxycodone tablets containing fentanyl or another synthetic opioid. MEJIA-NOLASCO was arrested on state charges, and he and his vehicle were removed from the area. The telephone seized from MEJIA-NOLASCO's person was observed to be receiving numerous incoming calls from the same Mexico-based cellphone number that both WARD and GURLEY appeared to be exchanging narcotics-related text messages with up to and following this seizure. This telephone was saved in MEJIA-NOLASCO's cellphone as "Don Raffa."

27. MEJIA-NOLASCO subsequently waived his *Miranda* Rights and spoke with CHP Officers at the CHP Office following his arrest. MEJIA-NOLASCO stated that he was working for a drug cartel in Mexico and owed a very large amount of money to this group and that he knowingly transported the drugs due to his debt.

28. Following the arrest of MEJIA-NOLASCO, GPS pings showed that WARD's telephone arrived in the area shortly thereafter, and WARD was subsequently intercepted speaking with GURLEY. They discussed the fact the courier had disappeared and that GURLEY was in contact with the source of supply who believed the courier had fallen asleep or had gotten a hotel. The following morning, GURLEY informed WARD that he had spoken to the source of supply who was now aware the courier had been arrested and that the source of supply had assured GURLEY that he would supply additional amounts of drugs to WARD and GURLEY to make up for the loss of these drugs. WARD continued to receive subsequent narcotics-related text messages from the Mexico-based "Don

Raffa" telephone repeating GURLEY's assurance that there would be additional drugs delivered in the near future. During subsequent calls, GURLEY used TT#6 to tell WARD that "Chango" had been previously intercepted over a telephone, and that this had led to his arrest and conviction so he was constantly instructing "the Old Man" who was "down there" and who had communicated with WARD during the time of the Lebec seizure to not talk openly on the telephone. GURLEY also stated that Chango was often "out of town traveling" and that he had "taken two hundred of them to Chicago."[1] As explained below, pen registers on the identified telephone for "Don Raffa" showed that this telephone engaged in subsequent WhatsApp contact with GURLEY over TT#6, which led me to believe that "the Old Man" had followed Chango's advice and used an encrypted app for drug communication.

29.  The substances seized from MEJIA-NOLASCO during the vehicle stop on 10-03-2019 were analyzed by the DEA Western Regional Laboratory as being 1002 grams of heroin and over 1,000 individual pills (109.4 grams) containing fentanyl.

**Additional calls with GURLEY discussing ongoing drug-distribution efforts**

30.  During the remainder of October 2019, I monitored numerous exchanges between GURLEY using TT#6 and WARD over TT#3 and TT#4, during which GURLEY discussed in explicit detail his ongoing drug trafficking activities with the sources who had supplied the drugs seized in Lebec, California earlier that month and his willingness to supply WARD with additional amounts of cocaine, heroin, and methamphetamine supplied by these individuals.

31.  GURLEY also discussed the fact that he was shipping large amounts of drugs, including pills, marijuana, and other drugs to customers in other states, including Texas. I note that on October 24, 2020, GURLEY called WARD from TT#6, and during this discussion, WARD asked if GURLEY had talked to his "Texas People." GURLEY confirmed he had and stated he was "going to send him some pills." GURLEY went on to say that he had a source who was going to be bringing him "ten of them," referring I believe to 1000-count quantities of counterfeit Oxycodone tablets containing fentanyl based upon the previous seizure and comments GURLEY made earlier to WARD about having him (WARD) contact GONZALEZ for the "blue things." GURLEY asked WARD if he had talked to "the Mexican," I believed referring to GONZALEZ, and if he had seen if the "Chinese Lady" would be "rolling through." I believe this was a reference to white heroin and/or fentanyl, as WARD was intercepted speaking about "China" repeatedly with Craig HUNTER. I believe that GURLEY was inquiring if WARD would be getting those drugs from GONZALEZ to include in the box he was shipping. GURLEY indicated he had gone to his other source to "grab some of that the other day." WARD indicated that he had spoken with GONZALEZ and

---

[1] All quotes stemming from the wiretaps come from the wiretap monitors' summaries or "line sheets."

that he believed it would be available soon.  They then had a discussion wherein
WARD indicated GONZALEZ did not "clean it all the way like that," referring to
the impurities left in the fentanyl and/or heroin he provided.  GURLEY went on to
explain in great detail how he packaged and shipped the drugs to Texas and why
he used UPS as opposed to FedEx because FedEx could and did search packages
on a whim.  During the time period of this and subsequent similar calls, TT#6 was
recorded in contact with two particular Ft. Worth, Texas area-code cellular
telephones, which I believe were the individual(s) GURLEY was supplying with
drugs in Texas.  TT#6 was still in contact with a particular Ft. Worth, Texas area-
code cellular telephone as of April 2020 as explained below.

32.    On October 26, 2019, GURLEY was intercepted on TT#6 having a discussion with
WARD on TT#4 during which GURLEY explained that Chango was mad because
GURLEY had traveled to Elk Grove, California and had met with Chango's "boy,"
who was the person taking whatever was not sold in this region to Chicago for
distribution.  GURLEY stated this person had inadvertently told GURLEY "the
real numbers" (*i.e.*, the prices they paid for kilograms of heroin) without "putting
the money on top of it" (*i.e.*, the higher price they were charging GURLEY).
GURLEY said on "the Tootsie" (which I know is common slang for tar heroin,
which resembles Tootsie Rolls in color and composition), they "did singles for 19-
5" (which I believe is a reference to $19,500 per kilogram of heroin), and that it
was "2-5 on the other ones" (which I believe is a reference to $25,000 per
kilogram of cocaine).  GURLEY stated that "they are getting a place out
there…..Chicago" and that if GURLEY showed them he could "do that fast," they
could get in on "the car and then Chicago" and by his "calculations it was over a
million dollars."  GURLEY said they could get plenty of "clear" (*i.e.*,
methamphetamine) and that Chango had told GURLEY to deal directly with the
individual Chango was hooking him up with who was going out to Chicago.
Based upon the current tolls on TT#6, discussed below in the toll analysis, I
believe this is still occurring.  Similar intercepts continued through October 31,
2019, when WARD was last intercepted contacting GURLEY at TT#6 and
inquiring about "Chango's people" and requesting that GURLEY contact them to
determine when the next shipment would be.  GURLEY indicated "they know
what they are doing."  I noted that during this same period, WARD and GURLEY
exchanged numerous drug related text messages over TT#6 up until October 31,
2019, to include WARD inquiring: "Did you get that order full for homegirl" (10-
29-19, 9:54 p.m.).  GURLEY responded over TT#6: "Don't got 10 fool I already
told you" (10-29-19, 10:21 p.m.).  On October 31, 2019, GURLEY engaged in a
drug-related call with WARD over TT#6 during which he discussed giving "that to
my dude" and the quality of the "shit" they currently had.  He also referred to "the
dude in Chicago."  Later, GURLEY sent WARD a text message over TT#6 at
approximately 1:44 p.m.: "I'll see at work today if he's str8."  I believe based on
the context of the prior conversation that this text message was GURLEY
indicating that he would be inquiring with his source later that day to see if his
source was "straight," ("str8"), which is slang for being ready to supply drugs.

**WARD continued to engage in repeated drug-related calls with GONZALEZ regarding obtaining additional drugs and discussing drugs previously sent to YANCY in Louisiana**

33.     GURLEY was intercepted on more than one occasion requesting that WARD call GONZALEZ in Stockton to obtain pills for one of GURLEY's customers.  WARD explained that he could not get any more drugs from GONZALEZ until he paid GONZALEZ the money he owed him for the drugs currently in Louisiana.  For the first two weeks of interception, WARD would repeatedly avoid taking GONZALEZ's calls from the predecessor to TT#5 (during which GONZALEZ would repeatedly leave expletive filled voicemail messages asking "Where is my money?") and would occasionally respond with text messages such as: "I'm going to call you a[nd] give you 25K in couple of days and meet and explain everything don't say or leave any message on this phone" (10-08-19, 6:07 p.m.).  GONZALEZ would respond: "Whats up you said a few days? Whats another lie?" (10-14-19, 6:20 p.m.).

34.     During the period of interception, WARD regularly (almost daily) contacted YANCY in Louisiana to discuss their ongoing efforts to move (sell) this heroin, collect the money owed GONZALEZ, and try to either return or sell the remaining heroin. A representative example of these calls occurred on October 15, 2019, at 11:45 a.m. WARD received a call from YANCY who said he did not have good news. YANCY said the people who had tested "the shit" said on a scale of 1 to 10 it was a 3 and that they had taken a piece of rock (*i.e.*, heroin) and were supposed to sell it to someone but no one would buy that. WARD told YANCY to zip lock it and send it to him because WARD needed the money and YANCY said he would send it to him. WARD asked if they did black tar and YANCY said they had some good tar on them right now and WARD said China was above tar. WARD said it had to be as small as possible when YANCY returned it, to vacuum seal it three times, but Vicks around it, vacuum seal it again then put it in the dryer then put it in the box. WARD said UPS, postal service. YANCY asked where and WARD said postal service. WARD said YANCY just needed to walk up to the counter. WARD asked YANCY if he knew a grocery store that does postal services. YANCY said he would see if "J" was going to do it. I believe this was one of many representative calls wherein YANCY explained his efforts to sell the poor-quality heroin and discussions regarding sending whatever cash he had collected and the remaining heroin back to WARD.

35.     Ultimately, on October 18, 2019, WARD was intercepted calling Kevin YANCY, who I believe was located in Louisiana at the time, from TT#3, during which it was clear he was with GONZALEZ who could be heard in the background and through direct conversation.  During this call, WARD instructed YANCY to explain to GONZALEZ what the holdup was in New Orleans due to the difficulty in distributing the heroin due to its poor quality and to confirm that YANCY would be sending some money and the rest of the poor-quality drugs back to California.  WARD also subsequently engaged in numerous calls with

GONZALEZ between 10-18-2019 and 10-31-2019 offering to sell methamphetamine, cocaine or marijuana to generate money to tide GONZALEZ over until YANCY sent the money that was owed. When GONZALEZ called and left voicemail messages demanding his money, WARD would sometimes respond with text messages as opposed to answering, such as: Need the other one (10-30-19, 3:06 p.m.).

36.    Following this event, GONZALEZ and WARD began communicating regularly over TT#4 and the predecessor to TT#5, during which they both were intercepted discussing a kilo-level heroin transaction that WARD was attempting to middle-man for a customer in Sacramento. I observed and recorded them meeting together in Sacramento on October 19, 2019, during which GONZALEZ provided WARD what I believe to be a sample of heroin to give to this potential buyer per the preceding calls.

37.    Specifically on that day, at 1:24 p.m., GONZALEZ told WARD during an intercepted call that his sources had a lot of pills. GONZALEZ said they had the new M40's which were stronger than the M30's. I believe this was in reference to the availability of counterfeit Oxycodone tablets, the currently most popular version being M30's, which contained fentanyl or a fentanyl analogue. WARD said he would call him back in an hour but he also needed the "black," *i.e.*, heroin, very badly. GONZALEZ indicated he had not obtained much heroin since WARD had not paid him recently but that he had already planned on calling his source of supply that day to arrange for more heroin and he would do so. Toll analysis showed that shortly thereafter, at 2:00 p.m., the predecessor to TT#5 placed a call and a text message to 52-6861970083, a Mexico-based cellphone with an area code that corresponds to the Mexicali/Baja California area. At 2:46 p.m., WARD received a call from GONZALEZ, during which WARD asked how much GONZALEZ was charging per pill if WARD purchased 1000. GONZALEZ asked if he wanted the M30's and WARD said M30's or M40's, whichever. GONZALEZ said they would finish eating and call him back. At 3:09 p.m., GONZALEZ called WARD who asked him what the numbers were on the pills and GONZALEZ said cheap, real cheap. GONZALEZ said he would give it to him for 19. WARD said he was broke but would call around to people. GONZALEZ stated that he would give it to him for 18-5. Shortly after the above-referenced call with an identified customer of WARD, WARD called GONZALEZ at 3:41 p.m. and related that he had a customer who wanted a whole thing of black (*i.e.*, a kilogram of heroin), which GONZALEZ acknowledged. WARD then told him to be ready. At 3:42 p.m., immediately following the call with GONZALEZ, WARD called GURLEY and lied and said the pills had all been purchased by another party and that they would have to do it another day but he would be grabbing a large amount of black shortly.

38.    WARD and GONZALEZ exchanged repeated calls throughout the day, during which GONZALEZ related that he only had 20 ounces/a half a kilogram of heroin left; however, he had placed an order for an additional two kilograms of heroin

based upon WARD's representations. WARD indicated he had confirmed with his customer that the customer's buyer was fine with obtaining a half-kilogram and that GONZALEZ should bring the heroin but cut out a small piece so WARD could deliver the sample to the customer. I subsequently observed GONZALEZ and WARD meeting at approximately 7:45 p.m. near the CINCH BAR in South Sacramento, during which meeting I believe GONZALEZ provided WARD with a sample of heroin for WARD's customer. Following this delivery of the heroin sample, WARD called GONZALEZ, who indicated that he would only deal with WARD for the entire transaction and would not meet anyone else and expected WARD to have the money. WARD subsequently informed GONZALEZ prior to 10:00 a.m. that the customer's buyer was satisfied with the sample but that the transaction could not occur until the following day.

39.    Similar and numerous narcotics-related calls and text messages continued between WARD (over TT#4) and GONZALEZ (using the predecessor to TT#5) from October 19, 2019, through October 31, 2019. During these calls, GONZALEZ repeatedly requested updates on how much money YANCY had managed to gather in Louisiana and how much heroin he would be sending back, which would then precipitate calls from WARD to YANCY making similar inquiries. During these calls, WARD at various times requested methamphetamine ("clear"), heroin ("black"), and cocaine ("white"), and fentanyl/opioid pills ("the pills"). An example of these conversations is a call on October 25, 2019, at 4:07 p.m. During this call, WARD asked GONZALEZ if he was "getting the white tomorrow" and asked if he had "the black," references to cocaine and heroin, respectively. GONZALEZ responded that he was getting the cocaine and had "20 pieces left" (*i.e.*, twenty ounces of heroin, as a "piece" is common slang for a 25-gram metric ounce of tar heroin), but that he needed the money WARD owed him. GONZALEZ made it clear during calls over subsequent days that WARD had to pay him the money he owed him for the drugs in Louisiana before he would provide him with additional drugs.

40.    On October 28, 2019, GONZALEZ called WARD and told him that he (GONZALEZ) had an emergency because "the people over there," were going to pick up GONZALEZ's father in Mexico if he did not send the money that was owed and that he expected WARD to go with him to Mexico and explain this to his sources himself. Similar calls continued over intervening days up until and including on October 31, 2019, when WARD again requested amounts of "black" (heroin) from GONZALEZ, and GONZELEZ again informed WARD that he had better call YANCY in New Orleans and get the drug proceeds, which led to calls to YANCY (who provided additional excuses for the delays in sending the money and remaining heroin), which led to angry texts and voicemails from GONZALEZ when WARD did not answer subsequent calls during the period of interception.

41.    I also noted through these intercepts that GURLEY used TT#6 to repeatedly discuss with WARD the fact that he (GURLEY) was harvesting large amounts of marijuana which he was manicuring at a specific location suspected as being his

stash location.  WARD was also intercepted numerous times speaking with
GONZALEZ over the predecessor to TT#5 requesting as many pounds of
marijuana as GONZALEZ could supply to ship to the customers in Texas, and
GONZALEZ indicated he could supply marijuana but that he would not until
WARD paid the money he owed him.

**Drug-Related Intercepts between Craig "Pep" HUNTER and WARD
identifying HUNTER as WARD's heroin customer, supplier, and co-
conspirator.**

42.  Beginning on October 3, 2019, agents intercepted an individual subsequently
identified as Craig "Pep" HUNTER contacting WARD from the number 916-507-
6145.  HUNTER, a Crips Gang member, was convicted in 2008 for Conspiracy to
Distribute Methamphetamine and Use of a Communication Facility and was
sentenced to 168 months prison and released to federal supervised release in the
Eastern District of California in 2019.  WARD referred to HUNTER during
subsequent calls as "Pep," and surveillance later observed WARD with HUNTER,
confirming "Pep's" identity.  On October 4, 2019, following the seizure from
MEJIA-NOLASCO described above, HUNTER called WARD as he drove back to
Sacramento, and WARD explained to him what had occurred.  HUNTER asked
WARD if the rest of the drugs were being delivered to Sacramento, and WARD
explained that he believed he would be receiving some drugs based upon Don
Raffa's text messages.

43.  On October 6, 2019, WARD was intercepted contacting HUNTER and having a
long conversation, during which HUNTER related that they had "given old boy all
that shit and that they could put a quarter on everyone."  HUNTER said he had
twelve but that he now only had eleven because he had already "done one."
HUNTER said he had waited for WARD but had "gone out of town to go get this
shit" because WARD was taking too long.  Based upon my training and
experience, I believe that the "shit" HUNTER referred to was heroin, and that the
numbers referred to ounces.  I believe that HUNTER was saying that "they" could
add a quarter ounce of adulterant to each ounce of heroin since the heroin was of
sufficient quality.

44.  HUNTER said he would provide the drugs to WARD to sell and then WARD
could give HUNTER the money in a few days.  HUNTER offered to "do that"
(*i.e.*, conduct the transaction) that night, and WARD agreed.  As explained further
below, HUNTER was intercepted on a separate wire intercept of a target in Los
Angeles a few days earlier apparently arranging to obtain what was believed to be
the replacement of ½ kilogram of bad-quality heroin that HUNTER, and I believe
this call was HUNTER offering WARD the heroin he had obtained in LA.

45.  During numerous subsequent intercepted calls between WARD and HUNTER,
HUNTER repeatedly told WARD that he could not wait for WARD and had "gone
out of town" again and had obtained heroin "down south" and that he wanted to

give WARD a large amount of this heroin to sell.  HUNTER stated that he set aside an additional 12 ounces of heroin to give WARD, which WARD could adulterate into 15 ounces and that he would split the profits with WARD if he could do that for HUNTER. It became apparent during subsequent calls that HUNTER had in fact given WARD some of this heroin even prior to these calls and wanted WARD to sell this remaining heroin as well. WARD demurred and indicated he would not be able to sell it, and HUNTER subsequently related he was going to have to return the heroin to his source because it was not good quality.  HUNTER was intercepted repeatedly calling WARD to arrange for the return of the portion of the heroin he had given WARD and expressed his frustration that WARD was "blowing him off" for a couple of days because it was preventing him from taking all of the heroin back to Southern California.

46. On October 10, 2019, WARD and HUNTER were intercepted arranging to meet in Sacramento, California so WARD could return the heroin to HUNTER to return to his source in Southern California.  Agents subsequently observed WARD meeting with HUNTER at the agreed-upon gas station.  HUNTER arrived in a rental car – a white 2019 Ford Flex, California License plate #8LDY007 – and thereafter I believe conducted the heroin transaction with WARD.

47. A GPS phone locator search warrant was authorized for HUNTER'S telephone. The phone locator information showed the phone located nearly every evening at the residence at **4705 Large Oak Court, Sacramento, California**.  I subsequently conducted surveillance of this location between October 10 and October 13, 2019, and observed the same white 2019 Ford Flex described above parked in the driveway of the residence repeatedly.  This was the only vehicle observed parked in the driveway or in front of the residence. Agents also observed HUNTER depart the residence in this vehicle as the sole occupant on more than one occasion.

48. On October 13, 2019, the GPS phone location data showed HUNTER's telephone traveling south from Sacramento along Highway 5 in the direction of Los Angeles, California. I contacted DEA Task Force Officer Scott Merritt who subsequently located the white 2019 Ford Flex, California License plate #8LDY007 traveling southbound on Interstate 5 north of Buttonwillow, California in Kern County. TFO Merritt subsequently arranged to have California Highway Patrol (CHP) Officers conduct a stop of this vehicle and contact the occupants.  HUNTER was one of the occupants of the vehicle.

49. I verified with HUNTER's federal probation officer that this residence – 4705 Large Oak Court, Sacramento, California  – was not HUNTER's listed probation address of record.  His Probation Officer believed based upon home inspections that HUNTER was not actually living at the address he had provided to the Court and was in fact living at another location in an effort to avoid inspection.

50. I also noted that immediately prior the above-described heated interaction between WARD and GONZALEZ on October 18, 2019, wherein GONZALEZ apparently

tracked down WARD in Sacramento and WARD put YANCY on the telephone to explain the problems with the heroin in Louisiana, WARD called HUNTER several times frantic that GONZALEZ had found him and was following him and had cornered him in a parking lot.  HUNTER indicated that he would retrieve a firearm he had and respond to WARD's location to assist him since they both feared GONZALEZ was going to be violent.

51.    I subsequently spoke with United State Postal Inspector Derek Stipler. Inspector Stipler informed me that a Federal District Court Judge had in October 2019 authorized the wire interception of the telephone used by a Hispanic Male heroin source of supply located in Southern California.  Inspector Stipler related that in the October 2019 interception of that individual's telephone, HUNTER had been intercepted using the same telephone which was being intercepted talking to WARD.  During these intercepted calls, HUNTER and the individual in Southern California discussed at length the fact that HUNTER was currently traveling to Southern California and obtaining large amounts of heroin from this individual and returning drug proceeds.

52.    Intercepts of WARD and HUNTER continued through October 31, 2019.  During these calls, HUNTER discussed the fact that he had been sending heroin out of state and that he intended to transport 100-pound quantities of marijuana to these same customers as well.  HUNTER also discussed the fact that he possessed a gun at his "spot."

53.    In November 2019, I spoke with Inspector Stipler who related that additional intercepts of the telephone of the target in Southern California were authorized by the court. During these calls in the first week of November 2019, HUNTER confirmed that he planned to drive to Southern California on approximately November 16 or 17 to deliver drug proceeds he owed this individual.

54.    In November 2019, I spoke with a Confidential Source, hereinafter referred to as the CS. It should be noted that the CS has an extensive criminal history for offenses including drug and firearms felony convictions. The CS has in the past provided assistance including information used in state and federal search warrant affidavits that have led to the seizure of large amounts of narcotics, including heroin, methamphetamine and cocaine, the seizure of firearms, and the successful prosecution of individuals for state and federal offenses. The CS has also provided undercover introductions and made controlled purchases of drugs himself.  I have not found the CS's information to be false in the past and due to the CS's above described success I consider the CS reliable. The CS primarily provided assistance in hopes of receiving monetary compensation and, at the time he/she was providing assistance, he/she was not doing so in the hopes of receiving consideration in any pending case.

55.    The CS stated that he had in the past obtained primarily cocaine and cocaine base from Craig HUNTER, whom he stated was also known by the moniker Pep. The

16

CS stated that he was aware that HUNTER had spent at least ten years in federal custody and had recently been released. The CS related that he had within the last two weeks of his meeting with me in 2019, ran into HUNTER in Sacramento and that HUNTER had been driving a white Ford Flex. The CS stated that HUNTER told the CS that he had resumed dealing drugs and had as many "CD's," which the CS stated was code used by HUNTER to refer to ounces of drugs, as the CS might be interested in obtaining. HUNTER provided the CS with a cellular telephone number at which he could be contacted. I verified this number was one of the same number HUNTER had been intercepted communicating over in the above-referenced intercepts.

56.   On November 18, 2019, members of the Sacramento County Sheriff's Department contacted HUNTER at 4705 Large Oak Court, Sacramento, California during the course of a state search warrant at that location. HUNTER claimed to be visiting his son at this residence, and nothing significant to the investigation was seized.

**Interception of wire and electronic communication of GONZALEZ over TT#5 in May and June 2020**

57.   On May 1, 2020, the Court authorized the interception of wire and electronic communication over TARGET TELEPHONE 5 (TT#5), 916-712-5816, the identified telephone for Agustin GONZALEZ. The interception of electronic communication over TT#5 began on May 4, 2020. The Court authorized the continued wire interception of TT#5 on June 2, 2020, which concluded on July 1, 2020.

58.   Upon intercepting GONZALEZ, it immediately became apparent that he was still having regular narcotics related communication with WARD over TT#3. GONZALEZ informed WARD that he had access to and would be willing to supply heroin, cocaine, methamphetamine and fentanyl at various times.

59.   Prior to the initiation of interception of TT#5, analysis of the tolls from this pen register showed it in high-frequency contact with **916-617-6672**, a T-Mobile cellular phone subscribed in the name of William Charles at 7900 48th Avenue, Sacramento. Per Experian/Equifax/CLEAR Thomas and Reuters/and TransUnion databases there has never been a record of a real person named William CHARLES listing at that address. Per Experian Gateway commercial credit database, an individual named David BYRD Jr. provided telephone **916-617-6672** as his contact phone as of February 14, 2020.

60.   Through inquiries with the Sacramento County Sheriff's Department, I learned that BYRD is a documented and validated Crips Gang Member with an extensive criminal history of violence. BYRD was wanted on an outstanding state arrest warrant for Assault with a Firearm on a Person and Felon in Possession of a Firearm since approximately 2011.

61.  An examination of BYRD's NCIC criminal history revealed the following: On or about January 29, 1989, BYRD was arrested in Sacramento County for Possession of Cocaine Base for Sale and Possession of a Dangerous Weapon; on or about April 26, 1989, BYRD was arrested in Sacramento County for Assault with a Deadly Weapon and Conspiracy to Commit a Crime; on or about September 27, 1989, BYRD was arrested in Sacramento County for Possession of a Controlled Substance.  Disposition for these charges is unclear from the records I reviewed.  On or about June 5, 1990, BYRD was convicted of Assault with a Firearm on a Person, a felony, and was sentenced to one year jail and six years of probation.  On or about October 10, 2005, BYRD was arrested in Sacramento County for Possession of Marijuana for Sale, Felon in Possession of a Firearm, Attempted Second Degree Murder, and Assault on a Person with a Semiautomatic Rifle.  On or about May 3, 2006, BYRD was convicted of Possession of Marijuana for Sale, a felony, and was sentenced to 32 months prison.

62.  On or about March 30, 2011, Sacramento County issued an arrest warrant for BYRD for Assault with a Firearm on a Person and Possession of a Firearm by a Felon with bail in the amount of $150,000.00.

63.  On May 1, 2020, the same day that the District Court Judge Troy L. Nunley authorized the interception of wire and electronic communication over GONZALEZ's telephone (TT#5), the Magistrate Judge Carolyn Delany authorized a search warrant for GPS ping information for 916-617-6672.  Interception of TT#5 began on May 4, 2020.  Subsequent GPS phone locator information for 916-617-6672 placed this telephone at BYRD's self-provided resident address, **7750 Leaverite Way, Sacramento, California** on that day and on most days during the tracking period.  Surveillance conducted by multiple agents on more than one day identified BYRD at this location at the same time the GPS phone locator information showed the phone present at this same location, leading me to believe that BYRD was in fact the user of this phone.

64.  Beginning on May 4, 2020, GONZALEZ was intercepted having what I believe to be clearly drug-related contact with BYRD at 916-617-6672.  GONZALEZ asked what was going on and related that "the guy with the China" had called him and he would hopefully have good news in a few hours.  BYRD asked if it was about both, and GONZALEZ said yes.  BYRD said he did not have the money yet, that a third party was making it hard on him but that he had $60,000.00 out there and wanted BYRD to come get it. GONZALEZ asked if he was going to drive down there because that was a long way and BYRD said yes and that the money was sitting there.  BYRD said he would go get it and then reiterated that it was currently $60,000.00.  GONZALEZ stated he had to talk to the guy today.  BYRD told GONZALEZ he needed "the clear" too, and GONZALEZ stated he would talk to him in a few hours.  I believed that this exchange regarded money BYRD owed GONZALEZ for drugs, to include heroin ("china") and methamphetamine ("clear"); BYRD indicating that his out-of-state customers had approximately

$60,000.00 at that time; and GONZALEZ relating that they would have to provide money to his source prior to a new shipment of drugs he anticipated.

65.    Similar drug-related intercepts of GONZALEZ and BYRD continued through May 2020.  During these calls, GONZALEZ and BYRD lamented the lack of available drugs due to the Covid-19 pandemic and their efforts to obtain drugs.  BYRD requested on more than one occasion for GONZALEZ to come by BYRD's house. GPS phone locator information for their respective telephones showed them both present at BYRD's residence at **7750 Leaverite Way, Sacramento, California** at those subsequent times, confirming that they were meeting in person.  It appeared during some of these intercepts that GONZALEZ had some drugs for BYRD but not the quantity that BYRD requested or required.

66.    On May 9, 2020, GONZALEZ received a text message over TT#5 from **916-831-8835**: *Dirt New Number*.  In following days, I noted that TT#5 stopped having contact with BYRD's then-current number (916-617-6672) and began having contact with **916-831-8835** and that the user of this telephone appeared to be BYRD continuing similar narcotics related calls with BYRD. Inquiries with AT&T showed that 916-831-8835 was subscribed in the name of Darla BYRD, David BYRD's identified wife, at **7750 Leaverite Way, Sacramento, California**, BYRD's identified residence.

67.    During these intercepted calls, BYRD agreed to come to Stockton, California to assist GONZALEZ at a time when GONZALEZ was being threatened over a drug debt and on a specific day when a person came to collect this debt on behalf of individuals in Mexico. BYRD was observed driving GONZALEZ around GONZALEZ's neighborhood by agents concurrent to intercepted calls in which GONZALEZ indicated that he and BYRD were looking for the individual who had shown up at GONZALEZ's residence and apparently threatened his family. During these calls, GONZALEZ related that BYRD had brought firearms with him from Sacramento in case they found the individual.

68.    On May 17, 2020, GONZALEZ was intercepted contacting several individuals, including WARD and BYRD (at **916-831-8835**) at which time he advised that he had just obtained a large amount of heroin.

**May 17, 2020 arrest of Manuel Soto GREENHALGH and seizure of just under two kilograms of heroin**

69.    On this same day (05-17-2020), at 7:05 p.m., GONZALEZ called 916-620-3159 and spoke to an individual subsequently identified as Manuel Soto GREENHALGH, aka: GREENHALUGH.  I subsequently verified with the Sacramento County Sheriff's Department that GREENHALGH was validated as a Norteno gang member.  Toll analysis of TT#5 in 2020 showed it in very high-frequency contact with 916-620-3159 the entire year, but this was the first intercepted call with the number since the interception of TT#5 began. GONZALEZ told GREENHALGH that there had been a lot of problems but that

he was still alive and that he was ready.  GREENHALGH asked if he could come out to meet him today or tomorrow.  GONZALEZ said he was going to his house and was currently at the storage and that GONZALEZ would call GREENHALGH back in about 15 minutes.

70.    At 7:50 p.m., GONZALZEZ called GREENHALGH, whom he addressed as Juanito. GONZALEZ said he was ready but he had bad news and that it had gone up. GREENHALGH asked how much and GONZALEZ said "one G," *i.e.* $1000. GONZALEZ said that he had only received two, and GREENHALGH asked when it would be available.  GONZALEZ said it was ready whenever GREEHNALGH wanted it.  GREENHALGH responded he would take a shower and be right over. GONZALEZ stated he would wait for GREENHALGH at his house.

71.    At approximately 9:21 p.m., GREENHALGH called GONZALEZ and said he was outside. When GONZALEZ hung up the phone, it appeared that his telephone (TT#5) immediately and accidentally dialed GREENHALGH's telephone, which answered, but that neither individual knew the line was open.  Monitors could hear GONZALEZ greeting GREENHALGH and heard them having a discussion about the difficulties of things and people crossing the border.  GONZALEZ said he was supposed to get seven but had only received two.  GONZALEZ lamented that nobody wanted to send drivers.  GONZALEZ said they just came up with the car right now and that the guy got like fifteen but only gave GONZALEZ two.  This conversation went on for over 3 minutes in the same vein before the call was terminated.

72.    Shortly thereafter, GREENHALGH was observed departing GONZALEZ's residence by San Joaquin County Sheriff Detective Michael Strickland in a 2016 Ford Fusion.  Officers followed the car northbound on Interstate 5.  A San Joaquin County Sheriff's Department marked unit conducted a vehicle code stop of the vehicle north of Lodi at the Turner Road exit of Highway 99.  GREENHALGH was determined to be the sole occupant and driver of the vehicle.  During this contact, deputies located approximately two kilograms of suspected heroin (which presumptive field tested positive for heroin) in the trunk of the vehicle, two cellular telephones, and over $3000 cash in GREENHALGH's possession.  The DEA lab subsequently confirmed that the substances in GREENHALGH's trunk was 1,986.6 grams of heroin.  GREENHALGH provided his cellular telephone number as 916-620-3159, the same number over which he was intercepted communicating with GONZALEZ. GREENHALGH was arrested on state narcotics charges and released.

73.    On May 18, 2020, at 8:42 p.m., GREENLHAULGH called GONZALEZ at TT#5. GREENHALGH related that he had been followed from GONZALEZ's house the previous evening and went to jail last night. GONZALEZ asked who had followed him, and GREENHALGH said the Sheriffs were watching GONZALEZ house and to be careful.  GONZALEZ asked if he was sure and GREENHALGH said yes and he was caught and they found it and GONZALEZ needed to stop. GONZALEZ

thanked GREENHALGH and GREENHALGH said he was not going to call anymore.

**June 30, 2020 arrest of David BYRD and seizure of several thousand fentanyl pills, $20,980 USC, and multiple firearms**

74.    During the remainder of May and continuing through June 2020, GONZALEZ and BYRD continued to be intercepted engaging in clearly narcotics-related conversations. A representative call occurred on May 31, 2020.  During that call, BYRD stated "I'm dead. I can't move forward until you do something." BYRD stated "People are saying it's twenty-nine. I talked to that other person you know." BYRD also said "My cousin had a little bit of it but it was real bad, it was garbage. I cooked it for him and he only got 7 grams out of each thing. It is only good for snorting."  GONZALEZ told BYRD that "I am supposed to see the guy that is up here. I am trying to get his phone number.  I also talked to the other line.  I will get it from one or both of them." BYRD also asked about "clear" and reminded GONZALEZ "You said on the 31st they were going to start letting people through – it's the 31st."  GONZALEZ told BYRD that things would have to start happening because it couldn't keep going on like this and that one of the sources would come through.  I believe that during this call, BYRD inquired about the availability of both Cocaine and Methamphetamine.  His reference to "twenty-nine" was for a current price for a kilogram of cocaine and his reference to "cooking it" and only getting back "7 grams" and it only being good for "snorting" was a reference to converting powder cocaine into crack cocaine only getting back 7 grams of cocaine base from 28 grams of powder cocaine which meant it was only good for inhaling as a powder instead of smoking as a solid.  I also believe that GONZALEZ was referring to a Mexico connection who had indicated during intercepts that he was traveling from Mexico to California to conduct narcotics-related business with GONZALEZ.  I also believe that GONZALEZ's reference to talking to "the other line" that day referred to an individual using a 442-area code phone with whom GONZALEZ had previously been intercepted in calls and texts having clearly narcotics-related communication.

75.    In late May and early June 2020, GONZALEZ was intercepted contacting BYRD and telling him that he anticipated having additional methamphetamine for him supplied by a source who was coming from Mexico.  Specifically, BYRD asked GONZALEZ "if they were still going to let people come across [the border] on the 31st."  GONZALEZ responded, "yes."  He then said that he "had a friend that came from over there [Mexico] but that he was having trouble getting the phone number."  He explained that he "was going to go meet with some new guys later" that day.  They then discussed the quality of the drugs they had been receiving, how it had been cooked and adulterated, and how much adulterant they could add. BYRD said he also needed "clear" *(i.e.*, methamphetamine) and that he could "do the same thing with the clear" (*i.e.*, adulterate it).  BYRD said that if GONZALEZ could get the "clear," soon, "they would make some fast money."  GONZALEZ also related that he currently had access to very large amounts of marijuana and that he also had pills available for sale and he could bring BYRD samples.  GPS

phone locator information showed GONZALEZ's telephone at BYRD's residence at 7750 Leaverite Way, Sacramento, California subsequent to this call.

76.    On June 19, 2020, BYRD was intercepted calling GONZALEZ and telling him that a customer wanted the pills right now ("dude wants the pills right now"). GONZALEZ agreed to deliver them to BYRD. GPS phone locator information for GONZALEZ's telephone that evening showed it at BYRD's residence at the same time BYRD's telephone was at the same location (**7750 Leaverite Way, Sacramento, California**). I believe that GONZALEZ was at BYRD's residence to deliver the pills they had discussed.

77.    The following day (06-20-2020), BYRD was intercepted calling GONZALEZ. During this call, GONZALEZ complained that one of the $100 bills that BYRD had given him was fake, and BYRD told him to return it the next time they met. On June 22, 2020, GONZALEZ was intercepted calling BYRD. BYRD told GONZALEZ that the pills were "not good" and that they had "no power." BYRD told GONZALEZ to not give the pills out because GONZALEZ would have problems with people. GONZALEZ related he did not know how that could be because they had come sealed. BYRD told GONZALEZ that one of his distributors had sold 20 here, 30 there, and that people had complained about the quality. So, BYRD told his distributor to throw the rest away and that BYRD would give him his money back. GONZALEZ told BYRD he would give him his money back as well and that he would come to BYRD's house within a few days.

78.    On June 30, 2020, BYRD was intercepted contacting GONZALEZ and saying he would be coming to meet him. Based upon these intercepts and the above information, surveillance was established at the residence of GONZALEZ at 4780 EWS Woods Blvd., Stockton, California. Det. Strickland subsequently observed a blue Mazda SUV, Nevada license #378L34 (subsequently determined to be a rental vehicle), arrive at the residence and park in front. Det. Strickland observed BYRD exit the passenger side of the vehicle and meet with GONZALEZ outside the residence. Both individuals then walked into the residence. Det. Strickland observed that the female driver of the vehicle, subsequently identified as Latoya Sells, remain seated in the driver's seat. Over an hour later, Det. Strickland observed BYRD exit the residence carrying a small box that he placed in the vehicle through the rear passenger door. BYRD then walked back to the residence. Det. Strickland ultimately observed BYRD and GONZALEZ exit the residence together and shake hands at the street in front of the vehicle before BYRD left in the rental car.

79.    Agents followed the vehicle north on Highway 5. Just prior to the Eight Mile Road exit, Sells rapidly crossed four lanes of traffic, and the CHP conducted a vehicle code violation stop as the vehicle exited at this location. Sells did not come to an immediate stop despite CHP activating lights and continued east on Eight Mile Road before turning into the Oak Grove Park entrance where she finally stopped the vehicle south on the entrance road. CHP officers contacted Sells and BYRD at

this time and BYRD initially presented fake identification and claimed he was another person before finally admitting he was in fact Dave BYRD and was aware that he had outstanding arrest warrants. BYRD was then arrested on the outstanding warrants from Sacramento County.

80.    During a search of the vehicle subsequent to BYRD's arrest, CHP officers located a large amount of suspected counterfeit blue M30 Oxycodone tablets believed to contain fentanyl, as well as a loaded Glock P80 9mm semi-automatic pistol (no serial number) and an envelope containing what was later determined to be $20,980.00 United States Currency (USC), all on the rear passenger seat of the vehicle.  BYRD subsequently made statements to officers that Sells had no idea what was in the vehicle and that everything belonged to him.

81.    Det. Strickland and I subsequently responded to the scene and spoke with BYRD who was in handcuffs at the rear of one of the CHP marked units. Det. Strickland and I escorted BYRD to a wooded area where he was un-handcuffed. BYRD stated that everything belonged to him and that Sells was not involved in his "business." I read BYRD his *Miranda* Rights.  BYRD told me that he would be out of custody by that evening as he had pre-paid the bond on his Sacramento arrest warrants in the event this happened. I told BYRD that being arrested for Assault with a Firearm was pretty serious and BYRD laughed and said that this was the third time that he had been arrested for this same charge. BYRD explained that he been arrested for the same thing when he was 17 and that he had been arrested and charged again as an adult and had been on the run for 10 years on the second charge and after he was finally arrested the one remaining living witness against him had died a month before the scheduled trial and they had dropped those charges. BYRD said this time he had been on the run for eight or nine years and had even been in Mexico for a time and had been arrested and released down there while knowingly absconding from the current pending charges. I told BYRD he should slow down now that he was older and not get involved in guns or shooting folks. BYRD said he needed to have a gun to protect himself from people who wanted to hurt him and that "the reason I used a gun last time was because you can't let people get away with doing stuff to you."  BYRD also stated that most of the money in the envelope on the back seat was from "a small business loan" and that at least half of it just came from the bank and he believed it was $22,000.00.

82.    I asked BYRD where he lived and he stated that he lived on 48th Avenue in Sacramento and there was nothing at his residence. I told BYRD that it was possible that a search warrant would be obtained for his residence which I believed was actually located at 7750 Leaverite Way, Sacramento, California.  BYRD adamantly denied living at that residence.  Members of the Sacramento HIDTA Team subsequently executed a state search warrant at 7750 Leaverite Way, Sacramento, California later that day and determined that BYRD lived at that residence and located an additional pistol, suspected crushed fentanyl tablets, 20 pounds of marijuana and an indoor marijuana grow (37 plants) in addition to indicia in the name of BYRD throughout.  BYRD was arrested on the outstanding

Sacramento County arrest warrants as well as new charges in San Joaquin County for Felon in Possession of a Firearm/Ammunition, Possession of a Controlled Substance and a Firearm, Possession of a Controlled Substance for Sale, Transportation/Sales of a Controlled Substance, and other charges.  BYRD was booked into San Joaquin County Jail and was subsequently released on bond.

83.   I verified that the BYRD pled guilty to Possession of a Firearm by a Felon, a felony, in Sacramento County and was sentenced to Probation. I also verified that the Assault with a Firearm on a Person and Possession of a Firearm by a Felon charges which BYRD had absconded from since 2011 were dismissed.

84.   The pills seized from BYRD were subsequently analyzed by the DEA Western Regional Laboratory as being 216.2 grams of fentanyl.

**Probable Cause that the above members of this DTO are continuing to engage in Drug Trafficking and that there is Probable Cause for the issuance of a Search Warrant for the Residences of GONZALEZ, GURLEY and WARD**

85.   During the intercepts of GONZALEZ described above, he was intercepted having calls with his son Agustin GONZALEZ Jr. who resided with him at their then-residence in Stockton, California. During the period of interception, GONZALEZ and GONZALEZ Jr. engaged in narcotics-related discussions involving suspected fentanyl tablets, specifically the pills he provided BYRD, and drug proceeds he owed his source of supply in Mexico. The investigation of GONZALEZ's suspected drug sources of supply for cocaine, methamphetamine, fentanyl, and heroin continued through 2021.

86.   In January 2023, I was contacted by agents from the DEA New Orleans Office who related to me that Agustin GONZALEZ Jr. had been stopped and arrested that month at the New Orleans International Airport while in possession of luggage containing approximately fifty pounds of marijuana and suspected counterfeit blue oxycodone tablets containing fentanyl. GONZALEZ Jr. provided a resident address in Galt, California which I knew from database checks and surveillance in 2022 was the location of the residence of his father Agustin GONZALEZ Sr.  They had moved to this address in late 2022, and they both provided this address as their residence per multiple database inquiries.  I believe it was highly likely based upon GONZALZEZ Jr. attempting to transport the suspected marijuana and fentanyl to New Orleans that the trafficking activities between GONZALEZ Sr., WARD and YANCY were still ongoing as of early 2023.

87.   I was informed by United States Marshal's Service (USMS) Deputy Rob Howes that he had confirmed with a commercial business in Sacramento in late January 2023 that WARD had that month provided a contact number of TARGET TELEPHONE 3. I obtained tolls from T-Mobile for this number and confirmed that it is still the same account information and that this telephone is currently still active. I subsequently obtained tolls for TARGET TELEPHONE 3 during 2023

and verified that it was in contact with GURLEY's known telephone number as well as with a cellular telephone subscribed to Eva GONZALEZ, Agustin GONZALEZ's wife in whose name prior intercepted telephones he had used had also been subscribed. I further noted that WARD's telephone was still in contact with the identified telephone for YANCY in New Orleans. This further led me to believe that the conspiracy to distribute drugs between the above individuals was still ongoing as of early 2023.

88.   In early 2023, USMS Deputy Howes also consulted with GURLEY's current Federal Probation Officer who confirmed that GURLEY was still providing a resident address at his mother's (Linda Graves) residence on Cranston Way in Sacramento and was still providing a contact cellular telephone of 916-870-2093. I confirmed with AT&T that this telephone was still active and subscribed in GURLEY's name. On a date in January 2023, the Federal Probation Officer arranged for a probation meeting and compliance check with GURLEY at his listed residence. Prior to this date, Deputy Howes and other Deputies had conducted surveillance of this location and had not observed GURLEY or his vehicle. On the date of this pre-arranged meeting, Deputy Howes and other Deputies established surveillance in the morning prior to the time of the visit. Shortly before this visit was to take place, Deputies observed GURLEY arrive in the area but park his vehicle around the corner a significant distance away for the residence and they observed him walk to the residence. Immediately following the visit with the Probation Officer, Deputies observed GURLEY walk back to his vehicle (which was still parked around the corner a significant distance away on another street) and depart. I noted that this activity appeared identical to GURELY's previous actions to mislead his probation officer and to hide his true residence and vehicle and Deputy Howes concurred and verified that GURLEY's vehicle was not subsequently observed at his mother's residence on subsequent dates.

89.   Based upon this analysis, I believed that WARD was continuing to use his "Azim RASAL" T-Mobile telephone **TARGET TELEPHONE 3** (916-912-1816), to conduct his ongoing conspiracy with GONZALEZ and YANCY to distribute quantities of heroin, fentanyl, cocaine, cocaine base, methamphetamine and marijuana to the various members of his drug network as evidenced by the arrest in New Orleans of GONZALEZ Jr. in 2023 while in possession of Fentanyl and Marijuana which I believe was destined for YANCY. I also believe that WARD was continuing to use this telephone to coordinate his drug trafficking activities with his brother, Albert GURLEY. I also believe that GURLEY is most likely continuing to use a series of "burner" telephones to conduct his ongoing trafficking activities but that he is continuing to his "legitimate" self-subscribed AT&T telephone (916-870-2093) for contact with Federal Probation. I believe based upon his clear prior (2020) and more current (2023) efforts to maintain a separate residence unknown to Federal Probation that he was still engaged in this activity as of early 2023.

90.    Based upon the foregoing, the Honorable Carolyn K. Delaney authorized a ping warrant on March 2, 2023, for information associated with **TARGET TELEPHONE 3** and **916-870-2093**. *See* 2:23-SW-0216-CKD. The phone locator information for both telephones obtained during mid-March through mid-April narrowed down both individual's suspected locations to two clearly defined neighborhoods within South Sacramento and to those specific areas during the particular hours of the night when it was believed both WARD and GURLEY were at their current residences. However, law enforcement was unable to physically locate WARD and GURLEY during the data collection period.

91.    In mid-2023, USMS agents contacted a local automotive business who had serviced a vehicle brought in by WARD to be serviced and for which he provided a contact address of **8499 Marvista Court, Elk Grove, California,** WARD's current listed resident address with DMV, and a contact number of TARGET TELEPHONE 3.  This vehicle was a 2008 white Dodge Van, California License #8GRN950, which per DMV records is registered to WARD and GURLEY's mother, Linda GRAVES. USMS Deputies Howes and Lara related to me that both WARD and this same vehicle, which he had been consistently observed  driving, had subsequently regularly been observed at the residence at 8499 Marvista Court during 2023 and as recently as December 2023. Deputies indicated that WARD was using a motorized wheelchair at this time and was observed both in front of the residence and in the garage.

92.    Based upon this mid-2023 information, the Honorable Kendall J. Newman authorized a ping warrant on June 6, 2023, for information associated with **TARGET TELEPHONE 3** and **916-870-2093**. *See* 2:23-SW-0551-KJN.

93.    The phone locator information for WARD's telephone showed it within the area of uncertainty (a couple hundred meters) of 8499 Marvista Court, Elk Grove, California during most hours of the evening and early morning, further confirming my belief that WARD was living at this residence.

94.    The GPS phone locator information for GURLEY's telephone showed it in the same immediate area in South Sacramento where it had been located in March and April of the year. Prior to this time but also in 2023, USMS agents contacted a local automotive business who had serviced a vehicle brought in by GURLEY to be serviced and for which he provided a contact  number of 916-870-2093.  This vehicle was a 2017 black Dodge Durango, California License #7ZOP227, which per DMV records is registered to WARD and GURLEY's mother, Linda GRAVES, just as the vehicle WARD is currently driving.

95.    In June 2023, using the court authorized GPS phone locator information for GURLEY's telephone, USMS Deputy Lara subsequently located GURLEY's black Dodge Durango SUV, California License Plate #7ZOP227, parked in the driveway at the residence located at **8364 Bloomington Drive, Sacramento, California** in the immediate area where the GPS location information showed

GURLEY's telephone most nights and early mornings. A license plate reader (LPR) also documented this vehicle parked in the driveway at this location on multiple occasions as far back as April 2023. Deputy Lara related that he subsequently observed this same vehicle parked at this residence regularly during late 2023 during most nights and early mornings, leading me to believe that this was the location which GURLEY was maintaining in an effort to avoid detection of his true residence by US Probation. I subsequently observed this vehicle at this residence myself during November 2023, and Deputy Lara also observed it at this location in December 2023. It is important to note that both WARD and GURLEY, who are both still in regular phone contact per recent toll records, are both apparently registering their current vehicles in the name of their mother (Linda GRAVES) at residences other than their own in an apparent continued effort to avoid detection by law enforcement of their current residences.

96.    On November 30, 2023, at approximately 9:00 a.m., I traveled to the South Sacramento County Waste Management Facility on Conservation Road in Sacramento, California. Prior to this date, I had verified that this company provided garbage service to 8364 Bloomington Drive, Sacramento, California. I had also verified that garbage service for that residence was provided on 11-30-2023 by the company. I made arrangements with the company to have the company-owned can which was provided to the homeowner switched out and brought back unopened to the waste management facility so that I could examine it. The company employee subsequently verified to me that the company owned can had been placed at the curb on 11-30-2023 by the residents of 8364 Bloomington Drive and that the can had been brought directly back to the yard where it was secured unopened until I arrived.

97.    I observed and photographed the can and the number "8364" painted on the top. I opened the can and examined the refuse. I noted it was filled with normal household refuse to include primarily food refuse and recyclable materials. I noted that there was no paper indicia, mailers or envelopes throughout the refuse whatsoever which was not my normal experience during numerous prior trash searches, *i.e.*, there was nothing in the trash bearing anyone's name, mail, bills, envelopes, and it appeared that these items were intentionally and specifically not placed in the trash cans. During a continued search of the refuse, I located a particular white plastic shopping bag. Inside this bag, I located a large number of various sizes and colors (black, orange, opaque) used rubber gloves. In this same bag I located clear plastic bags containing a small amount of white residue and an amount of tin foil bearing a brown-to-black residue. These items appeared consistent in my training and experience with items of drug packaging materials.

98.    On December 1, 2023, I met with El Dorado County District Attorney's Office Investigator James Applegate.  DA Investigator Applegate is a cross-designated DEA Task Force Officer (TFO) who has worked with the DEA Sacramento Office for many years as a narcotics investigator conducting federal narcotics investigations.  TFO Applegate is also a trained canine handler and he currently

utilizes a narcotics detection canine named Oda.  TFO Applegate provided me with the following statement with regards to his and Oda's training:

a)      Oda is a two-year-old German Shepherd dog.  Oda was trained and certified in Sacramento, California at a K-9 training/certification class instructed and overseen by K-9 Instructor John Riboni.  This class was designed specifically for the detection of illicit narcotics.

b)      The six-week training class provides the skills necessary for the officer/handler to work as a team in the detection of illicit narcotics.  During the course, the K-9 teams work in a variety of settings ranging from vehicles, houses, commercial buildings, and various other settings.

c)      Oda is trained to specifically detect four different narcotic odors:  marijuana, cocaine, methamphetamine, and heroin.  Oda is trained to alert passively by staring/pointing/sitting or other change in her behavior when she detects the odor of these narcotics.  Oda performs her detection work for a toy reward.

d)      The basic narcotic certification requires 120 hours of training, which Oda completed in July 2022.  Oda also completed a certification test at the end of this six-week course.

e)      Oda and her handler, El Dorado County District Attorney Investigator/DEA Sacramento District Office Task Force Officer James Applegate, #DA-54, completed the entire training program and certification process together and both have been assigned as a team to the DEA Sacramento District Office Task Force since October 2014.  Oda's training is continuous and occurs on a near daily basis, and also includes scheduled maintenance trainings.

f)      Oda and handler TFO Applegate's most recent certification test was executed and passed (Yearly Certification) in July 2023 in Sacramento, California.

99.  On December 1, 2023, TFO Applegate placed the above-described items of suspected narcotics packaging located in the refuse from 8364 Bloomington Drive in an open outdoor area initially obstructed from Oda's view.  I noted that at this time, Oda proceeded through this area and upon coming around a visual obstruction and observing the item of packaging Oda immediately stopped and sat down with her nose touching the object.  TFO Applegate related to me that this was a clear and strong alert in a fashion consistent with Oda's trained alert for the odor/presence of narcotics emanating from the item. I also observed this behavior.

100.  I subsequently verified that on May 5, 2023, Agustin GONZALEZ Jr. pleaded guilty and was convicted of possession of marijuana with intent to distribute (a felony) and possession of fentanyl (a felony) in Jefferson

28

Judicial District, Louisiana, and was sentenced to 3 years prison
(suspended) and two-years supervised probation with a search clause and
that this supervision was transferred to San Joaquin County (California)
Probation.

101.    I verified through multiple database checks (Thomas and Reuters CLEAR;
CA DMV) that both Agustin GONZALEZ Sr, Agustin GONZALEZ Jr.
and GONZALEZ's wife (Eva GONZALEZ) all began in mid-2023 to
supply an address of 19589 McKinley Avenue, Manteca, California.
Deputy Lara and I subsequently traveled to this location on multiple
occasions in December 2023 and observed  a vehicle currently registered to
GONZALEZ Sr., a silver 2012 Cadillac SUV, California License Plate
#7AHH107, parked in front of the residence. I observed that this property
was located in a rural area, that it was by itself on this road and had no
surrounding homes and was surrounded by open land, and that it was on
the edge of a new housing development outside of Manteca, California just
south of Highway 120. I also noted that this residence also had a large
barn-type workshop directly behind it.

102.    On January 5, 2024, during the early morning hours, I traveled to 19589 McKinley
Avenue, Manteca, California.  I established surveillance of this location.  I
observed GONZALEZ's registered vehicle, the silver 2012 Cadillac SUV, parked
directly in front of the detached garage of the residence. I also observed a vehicle I
recognized as a blue 2007 Cadillac Escalade with a truck bed, California License
plate #8Z29248, parked in front of the residence as well. I noted per DMV
inquiries that this vehicle was registered in the name of Delanious WARD, that the
registration was suspended but that there was a pending master file record which
indicated that a Smog Certificate had been issued for the vehicle in October of
2023.

103.    Prior to this date, I observed wheeled plastic garbage cans on the side of the
residence at 19589 McKinley Avenue. I contacted the City of Manteca refuse
department who advised me that they had no current record of garbage service
with that listed address; however, they related that the addresses in this rural area
were not well-recorded and that it was possible that garbage service was provided
to this location on the same day that they provided garbage service to Bronzan
Road which ran west from McKinley Avenue along the north side of the property.
I was advised that garbage service was provided on Fridays, specifically on 01-05-
2024. On this date, at approximately 2:00 a.m., at the same time I observed
GONZALEZ's and WARD's vehicles at the home, I observed that the two garbage
cans I had previously observed up against the residence, were now placed in front
of the property in the street at the curb and that they were both apparently full of
items and the lids were raised-open to accommodate the items in the can. I
observed that these were the only garbage cans on McKinley Avenue.

104.    During this surveillance on January 5, 2024, I was accompanied by Tracy Police

29

Department Detective Travis Alexander who is a trained canine handler.  He currently uses a narcotics detection canine named Koda. Detective Alexander provided me with the following statement with regards to his and Koda's training:

### "K9 "KODA"

### HANDLER: Detective Travis Alexander

### "KODA's" EXPERIENCE, TRAINING, CERTIFICATIONS and FINDS:

- Narcotic Detection K-9 training

Police K-9 KODA was certified with by Top Dog Police K9 training after successfully completing 120 hours of narcotics detection training. KODA was trained to detect the odor of four controlled substances: marijuana, methamphetamine, cocaine and heroin.

Since the team's initial certification, KODA and your Affiant have successfully completed ongoing maintenance training on canine contraband detection. The certification was administered by a Certified State of California Peace Officer Standards and Training (POST) Canine Team Evaluator, certifying to the State of California K-9 Team Standard annually (November 2023).

KODA and your Affiant train weekly on all odors the dog is trained to detect. This on-going training averages 8 hours per month.  On-going training includes:

1. Training in all areas of interdiction, such as vehicles, boats, truck tractor and trailers, schools, currency, parcels and mail, airports and airplanes, bus and bus depots, storage units, residences, trains and train depots, motels, apartments, etc.;

2. Training on various quantities of controlled substances, ranging from grams to pounds;

3. Training on novel odors, such as odors that are distracting, masking, or new;

4. Training on controlled negative (blank) testing, in which all objects or locations have no contraband present;

5. Extinction training, which proofs the dog and prevents him from alerting to common items associated with controlled substances, such as plastic bags, money, etc.

Your Affiant maintains training logs of the on-going training.

KODA's positive alert has established probable cause for narcotic finds:

K-9 KODA's alerts and detections have led to the recent separate seizures of cocaine, methamphetamine and marijuana in December of 2023.

### DETECTIVE ALEXANDER'S EXPERIENCE, TRAINING and CERTIFICATIONS:

- Alameda County Sheriff's Office Post Academy
- 4.5 years in law enforcement with 4.5 years patrol experience.

- Special Enforcement Team (1 year)
- Alameda County Sheriff's Office Post Academy
- Top Dog Police Canine 120 hours Basic K9 Narcotic Detection training (2023).
- Intermediate POST certificate.
- Electronic Surveillance – 8 hours (2023)

105.   Detective Alexander, Koda, and I subsequently walked southbound on McKinley Avenue from the corner of Bronzan Road and we walked directly in front of the house located at 19589 McKinley Avenue. I noted that at this time, Koda immediately stopped at the garbage cans and started jumping up and sticking her nose in the open lids of the cans, pointing with her nose and then sitting down and repeating this activity. Detective Alexander related to me that this was a clear and strong alert in a fashion consistent with Koda's trained alert for the odor/presence of narcotics emanating from an item. I also observed this behavior as well.

## TRAINING AND EXPERIENCE

106.   As a result of my experience and training, I have learned that traffickers who deal in various quantities of controlled substances, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions.  Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators. These records may be kept on paper or contained in memory calculators or computers.  It is also my experience that these traffickers tend to keep these accounts and records in their residence and in the areas under their control.  It is my training and experience, that in the case of drug dealers, evidence is likely to be found where the dealers live.  It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time.

107.   From my training and experience, I know that individuals involved in drug trafficking frequently store their drugs, drug proceeds, weapons, and other contraband in rooms and areas of their residences that appear to belong to, are controlled by, and/or are accessible to other occupants, including for example, bedrooms belonging to children, other family members, or roommates, in an effort to conceal the evidence from law enforcement and to disguise their ownership and control of the contraband in the event that it is seized.  This warrant therefore seeks permission to search the entire premises of the residence for which the warrant is sought, including any location where there is reasonable cause to believe the items listed in Attachment B may be found.  *See Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought.")*; United States v. Ross*, 456 U.S. 798, 820–21 (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also

provides authority to open closets, chests, drawers, and containers in which the weapon might be found."); *see also United States v. Adjani*, 452 F.3d 1140, 1146 (9th Cir. 2006) ("Although individuals undoubtedly have a high expectation of privacy in the files stored on their personal computers, we have never held that agents may establish probable cause to search only those items owned or possessed by the criminal suspect. The law is to the contrary.") (citing *Zurcher*); *United States v. Tehfe*, 722 F.2d 1114, 1118 (3d Cir. 1983) ("Property owned by a person absolutely innocent of any wrongdoing may nevertheless be searched under a valid warrant.") (cited with approval in *Adjani*).

108. Based upon my experience and training, I have learned that drug traffickers often place their assets in names other than their own to avoid detection of those assets by law enforcement and the Internal Revenue Service (IRS); that those persons are commonly family members, friends, and associates who accept title of assets to avoid discovery and detection; that traffickers also often place assets in the ownership of corporate entities to avoid detection by law enforcement agencies and although these assets are in other individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over them. Typically, traffickers keep records of those registrations and transactions in their residence.

109. I have learned that large-scale drug traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business.  It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles and other items of value and/or proceeds of drug transactions, including evidence of financial transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

110. In my experience, traffickers commonly have in their possession, that is, on their person, at their residence and in the areas under their control, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons.  Such firearms are used by drug violators to protect their illicit drug trafficking operations, and themselves against law enforcement and other drug violators because the illicit drug trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds.  Such property may include, but is not limited to, narcotics and other dangerous drugs, jewelry, narcotic paraphernalia, books, records, ledgers and quantities of currency.

111. In my experience, traffickers commonly have in their possession, that is on their person, at their residences, and their vehicles, and in the areas under their control and which they have free and ready access to, drugs, including but not limited to in this case, cocaine, which they intend to distribute.  It is my experience that these drug traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

112. In my experience, drug traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

113. In my experience, large scale traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver's licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and utilized in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

114. In my experience, drug traffickers often utilize vehicles in which to transport and distribute controlled substances in facilitation of their trafficking activities. It has also been my experience that traffickers will also utilize vehicles as locations in which to store controlled substances prior to distribution. During prior investigations, I have observed that drug traffickers will often utilize vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

115. In addition, these traffickers tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" the proceeds derived from the distribution of controlled substances.

116. In establishing these entities, the traffickers often must travel to meetings in foreign countries as well as domestically. As a result of that travel, records are generated reflecting travel by commercial and private aircraft, Commercial Ocean and private vessels as well as common carrier(s).

117. Individuals involved in the distribution of cocaine often make, or cause to be made, pictures, videos, movies, compact discs, floppy discs, or other such items which are or contain photographic or digital images in order to memorialize their cocaine distribution, use, possession, or any other activities surrounding their cocaine and cocaine trafficking activities, and that such items often identify co-conspirators in their cocaine trafficking activities.

118. It has been my experience in the past, and particularly in this case, that when suspects use mobile telephones to communicate with cooperating individuals or undercover agents to set up the cocaine deals, records relating to these activities will be found stored in the cellular telephone. And, as relevant to this case, the drug traffickers in this case have made extensive use of text messaging to communicate about his ongoing drug trafficking.

33

119. I know that narcotics traffickers use mobile telephones to communicate with one another, either by voice or text message. Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other narcotics traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Mobile telephones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by a narcotics trafficker is evidence of the associations of the narcotics trafficker, some of which are related to his or her illegal business. Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a narcotics trafficker's mobile telephone can contain evidence of narcotics trafficking because it shows the communications or planned communications of a narcotics trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or intended to communicate. Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Narcotics traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity. Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a narcotics trafficker. Mobile telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a narcotics trafficker who took pictures of evidence of crime. Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

120. As described above and in Attachment A, this Affidavit seeks permission to search and seize things that are related to the ongoing drug distribution activities by the co-conspirators in whatever form such things are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

121. It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken, that the items listed in Attachment B are items most often associated with the distribution of controlled substances, including cocaine, fentanyl, and heroin, as well as the proceeds from such illegal operations.

122. The facts set forth in this Affidavit are known to me as a result of my personal participation in this investigation, through conversations with other agents and detectives who have participated in this investigation, and from reviewing official reports, documents, and other evidence obtained as a result of this investigation. This Affidavit is not an exhaustive enumeration of the facts that I have learned

during the course of this investigation but, instead, are facts that I believe support a finding of probable cause to search the requested locations.

123. Based on my experience and training, and after consulting with other law enforcement officers experienced in drug investigations, I know that individuals involved in drug dealing often maintain at their residences, vehicles, and their persons the items described in Attachment B. Individuals involved in drug dealing also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances. Therefore, I am requesting authority to seize all the items listed in Attachment B to this Affidavit and incorporated here by reference.

## REQUESTED WARRANTS

124. I request that based upon this Affidavit, a Criminal Complaint and Arrest Warrants be issued for the following people for the following crimes:

   a. Delanious WARD, Albert GURLEY, Agustin GONZALEZ, and Craig HUNTER with a violation of 21 U.S.C. §§ 846 and 841(a)(1) – conspiracy to distribute and possess with intent to distribute at least 100 grams of a mixture and substance containing heroin and at least 40 grams of a mixture and substance containing fentanyl;

   b. Delanious WARD, Albert GURLEY, Agustin GONZALEZ, and Kevin YANCY, with a violation of 21 U.S.C. §§ 846 and 841(a)(1) – conspiracy to distribute and possess with intent to distribute a mixture and substance containing heroin;

   c. Jorge MEJIA-NOLASCO with two violations of 21 U.S.C. § 841(a)(1): possession with intent to distribute at least 40 grams of a mixture or substance containing fentanyl and possession with intent to distribute at least 100 grams of a mixture and substance containing heroin on October 3, 2019.

   d. Manuel GREENHALGH, with a violation of 21 U.S.C. § 841(a)(1) – possession with intent to distribute at least 100 grams of a mixture and substance containing heroin on May 17, 2020;

   e. David BYRD with a violation of 21 U.S.C. § 841(a)(1) – possession with intent to distribute at least 40 grams of a mixture or substance containing fentanyl on June 30, 2020.

125. Also, I respectfully request authority to search:

   A.) GONZALEZ's current residence located at **19589 McKinley Avenue, Manteca, California;**

B.) GURLEY's current residence located at **8364 Bloomington Drive, Sacramento, California**; and

C.) WARD's current residence located at **8499 Marvista Court, Elk Grove, California**.

## REQUEST TO SEAL

126. Finally, I respectfully request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant facesheets and sealing order. I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation into criminal activities by the defendants and their coconspirators. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants over the internet, and disseminate them to other criminals as they deem appropriate, *i.e.*, post them publicly online. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness, as well as endanger the safety of agents serving the warrant requested.

I swear under penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.


_____/s/_____
Special Agent Brian Nehring
Drug Enforcement Administration


Sworn to and subscribed before me on the ___9th___ day of January of 2024.


_____
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

Approved as to form:


Cameron L. Desmond
Assistant U.S. Attorney

36

**Attachment A-1**
**Location to be Searched**

A.    **19589 McKinley Avenue, Manteca, California**, further described as a single family, single story residence, tan with white trim, located at the southwest intersection of Bronzan Road, with the numerals 19589 on a black mail box in front of the residence at the curb, with a front door located on the right side of the residence facing out onto McKinley Avenue, with a large metal workshop at the rear of the residence and an access driveway on the left (south) side of the property.





37

**Attachment A-2**
**Location to be Searched**

B.   **8364 Bloomington Drive, Sacramento, California**, further described as a single
family, single story residence, cream colored with white trim and with the
numerals 8364 in black on a white background affixed to the front of the
residence immediately to the right of the garage door, with a front door with a
white metal security gate immediately to the right of the garage as well.



**Attachment A-3**
**Location to be Searched**

C.    **8499 Marvista Court, Elk Grove, California**, further described as a single family, two story residence, tan with darker tan trim, with a tile roof, with the numerals 8499 affixed to the front of the residence immediately to the right of the garage facing the street, located on the left at the end of the court.



**Attachment B**
**Items to be Seized**

Agents are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"), committed by the co-conspirators:

- Title 21 U.S.C. Sections 846 and 841(a)(1) – Distribution, possession with intent to distribute, and conspiracy to distribute and possess with intent to distribute Cocaine, Heroin, and Fentanyl

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1. Controlled substances, including Cocaine, Heroin, Fentanyl and Methamphetamine, or items frequently used to distribute those drugs, or items containing residue from the distribution of those drugs; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;

2. United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking, including the pre-recorded U.S. currency used to purchase Cocaine, Heroin, Fentanyl and Methamphetamine;

3. Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

4. Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846;

5. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

6. Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7.     Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8.     Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

9.     Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10.    Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person;

11.    Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records; and

12.    All names, words, telephone numbers, email addresses, time/date information, messages or other electronic data in the memory of the mobile telephone or on a server and associated with mobile telephones that are associated with the co-conspirators during execution of the warrant.  This authority to search such mobile telephones includes the following within each mobile telephone:

    A.     Incoming call history;
    B.     Outgoing call history;
    C.     Missed call history;
    D.     Outgoing text messages;
    E.     Incoming text messages;
    F.     Draft text messages;
    G.     Telephone book;
    H.     Data screen or file identifying the telephone number associated with the mobile telephone searched;
    I.     Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;
    J.     Voicemail;
    K.     User-entered messages (such as to-do lists);
    L.     Photographs; and
    M.     Any passwords used to access the electronic data described above.

13.  Marijuana plant samples and bulk manicured marijuana samples to be collected, documented, photographed and taken; bulk plant and manicured material to be disposed of per this order

## United States v.  Ward et al
**Penalties for Criminal Complaint**

**Defendants**
**Delanious Ward**
**Albert Gurley**
**Agustin Gonzalez**
**Craig Hunter**
**Kevin Yancy**
**Jorge Mejia-Nolasco**
**Manuel Greenhalgh**
**David Byrd**

**COUNT 1:**          **WARD, GURLEY, GONZALEZ, and HUNTER**

VIOLATION:          21 U.S.C. §§ 846, 841(a)(1) - Conspiracy to Distribute at least 100 grams of a mixture and substance containing heroin and at least 40 grams of a mixture and substance containing fentanyl

PENALTIES:          Mandatory minimum of 5 years in prison and a maximum of up to 40 years in prison; or
Fine of up to $5,000,000; or both fine and imprisonment
Supervised release of at least 4 years up to life

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 2:**          **WARD, GURLEY, GONZALEZ, and YANCY**

VIOLATION:          21 U.S.C. §§ 846, 841(a)(1) - Conspiracy to Distribute a mixture and substance containing heroin

PENALTIES:          A maximum of up to 20 years in prison; or
Fine of up to $1,000,000; or both fine and imprisonment
Supervised release of at least 3 years up to life

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 3:**          **MEJIA-NOLASCO**

VIOLATION:          21 U.S.C. § 841(a)(1) - Possession with Intent to Distribute at least 40 grams of a mixture and substance containing fentanyl

PENALTIES:          Mandatory minimum of 5 years in prison and a maximum of up to 40 years in prison; or
Fine of up to $5,000,000; or both fine and imprisonment
Supervised release of at least 4 years up to life

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 4:**          **MEJIA-NOLASCO**

VIOLATION:       21 U.S.C. § 841(a)(1) - Possession with Intent to Distribute at least 100 grams of a mixture and substance containing heroin

PENALTIES:       Mandatory minimum of 5 years in prison and a maximum of up to 40 years in prison; or
Fine of up to $5,000,000; or both fine and imprisonment
Supervised release of at least 4 years up to life

SPECIAL ASSESSMENT: $100 (mandatory on each count)


**COUNT 5:**          **GREENHALGH**

VIOLATION:       21 U.S.C. § 841(a)(1) - Possession with Intent to Distribute at least 100 grams of a mixture and substance containing heroin

PENALTIES:       Mandatory minimum of 5 years in prison and a maximum of up to 40 years in prison; or
Fine of up to $5,000,000; or both fine and imprisonment
Supervised release of at least 4 years up to life

SPECIAL ASSESSMENT: $100 (mandatory on each count)

**COUNT 6:**          **BYRD**

VIOLATION:       21 U.S.C. § 841(a)(1) - Possession with Intent to Distribute at least 40 grams of a mixture and substance containing fentanyl

PENALTIES:       Mandatory minimum of 5 years in prison and a maximum of up to 40 years in prison; or
Fine of up to $5,000,000; or both fine and imprisonment
Supervised release of at least 4 years up to life

SPECIAL ASSESSMENT: $100 (mandatory on each count)